IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SCOTT E. BROWN,                    )
                                   )
              Petitioner,          )
                                   )
    vs.                            )          Case No. 4:04CV00579 ERW (AGF)
                                   )
DAVID DORMIRE,                     )
                                   )
              Respondent.          )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pro se petition of Missouri state prisoner

Scott E. Brown for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action was

referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for recommended

disposition. For the reasons set forth below, the Court recommends that federal habeas

relief be denied.

**PROCEDURAL SUMMARY**

On October 1, 1997, a jury found Petitioner guilty of first-degree murder for the

January 14, 1992 strangling death of his wife, Rebecca Lynn Brown. The jury assessed

the punishment to be life imprisonment without the possibility of probation or parole.

Petitioner filed a motion for a new trial, and this motion was granted on October 24,

1997. The court concluded that certain unsolicited statements of a state's witness (John

Conway) denied Petitioner a fair trial, in light of the fact that the State had barely made a

submissible case.

On November 7, 1997, the State filed a motion for rehearing of the order granting Petitioner a new trial. By this point, a new judge had been assigned to the case. The State's motion was denied on November 21, 1997, and on that same day, the State filed a notice of appeal. On November 17, 1998, the Missouri Court of Appeals reversed the grant of a new trial, and remanded the case for sentencing. On January 14, 1999, the trial court sentenced Petitioner to life imprisonment without the eligibility for probation or parole, and on March 21, 2000, the conviction was affirmed on appeal. Resp. Ex. J.

On July 10, 2000, Petitioner filed a pro se motion for post-conviction relief under Missouri Supreme Court Rule 29.15. An amended motion was filed on October 20, 2000, with the assistance of appointed counsel. This motion was denied by the motion court on November 26, 2002, and the denial was affirmed on appeal on December 9, 2003.

On May 11, 2004, Petitioner filed the present action. He claims that his constitutional rights were violated in the following ways:

The appellate court lacked jurisdiction to hear the State's appeal of the order granting Petitioner a new trial, because the appeal was filed beyond the ten-day period allowed for filing such an appeal;

Petitioner's trial counsel was ineffective in failing to object to the admission of evidence and comments by the prosecutor during closing argument indicating that Petitioner was homosexual;

The trial court improperly rejected Petitioner's request to give a circumstantial-evidence instruction, and counsel on direct appeal was ineffective for failing to raise this matter;

Two claims raised in Petitioner's pro se post-conviction motion were not addressed by the motion court or by Petitioner's post-conviction appellate

counsel.[1]

Respondent does not address the last claim noted above.  Respondent argues that Petitioner's claim that the appellate court lacked jurisdiction involves only a matter of state law, and so is not cognizable in this federal habeas action; and that habeas relief should be denied on the remaining two claims, because the state courts' adjudication of them was factually and legally reasonable.

## BACKGROUND

### Trial

In a motion in limine, Petitioner sought to exclude any reference to his being homosexual.  The parties agreed that the State would not make any such references during voir dire or in opening statement.  Resp. Ex. G at 45, 51.

In affirming Plaintiff's conviction on direct appeal, the Missouri Court of Appeals summarized the evidence, viewed in the light most favorable to the verdict, as follows.  Although Petitioner challenges the sufficiency of the evidence, he does not assert that this summary is inaccurate, and this Court's own review of the record establishes the summary's accuracy.

> Defendant and Rebecca Brown ("Rebecca") were married in July 1990.  From November 1990 until April 1991, Defendant and Rebecca lived with Rebecca's sister, Wanda, and her husband in Nebraska.  During that period, Wanda observed that Defendant was the dominant party in the marriage and that Rebecca was concerned with pleasing Defendant in every way.

---

[1] This claim was submitted on a separate piece of paper attached to the petition.

Defendant also kept Rebecca on a budget for any personal items by providing her with a monthly allowance of about $50. If she spent her allowance and needed something else that month, she would need to ask Defendant for an advance on the next month's allowance.

In May 1991, Defendant and Rebecca became house parents at a group home, Black Lake Lodge, for troubled teenage boys in Indiana. Also in the summer of 1991, Rebecca was diagnosed with a kidney disease. Although there was no immediate danger to her health, she might have needed a kidney transplant or dialysis in ten to twenty years.

In November 1991, Defendant accepted a position as a youth pastor at a church in Creve Coeur, Missouri. As a result, Defendant and Rebecca moved to St. Charles in December 1991.

On January 10, 1992, Rebecca's sister, Linda, visited Defendant and Rebecca at their home. During this visit, Defendant mentioned to Rebecca that he wanted her to take a sleeping pill that evening.[1] Rebecca said that she did not need one. Defendant replied "I paid a dollar a piece for those pills and you are going to take them all." Also that evening, Rebecca, out of the blue and chuckling, said "I would be worth more to [Defendant] dead than alive with the great life insurance we have on me. [Defendant] will be a rich man when I die and I don't care what he does with the money when I'm gone, that's up to him." After making this statement, both women looked at Defendant who was frozen staring over a notebook pad holding a pen.

On the morning of January 13, Rebecca telephoned a former supervisor in St. Louis, leaving a message on his answering machine. When he returned the call later that morning, Defendant answered the telephone and told the former supervisor that Rebecca was out looking for a job. Rebecca returned the call later that afternoon. A potential employer for Rebecca also telephoned that day to confirm a second interview for the next day. However, the employer received a busy signal or the wrong number each time she dialed the telephone number that Rebecca had provided to her.

On the afternoon of January 13, Defendant and Rebecca locked themselves out of the house while loading their car with laundry to take to Rebecca's parent's house. Upon arriving at her parent's house, Defendant telephoned a locksmith. The locksmith asked Defendant for his name,

address, and phone number, to which Defendant replied that there was no phone. Later that evening, Defendant met the locksmith at their house while Rebecca remained at her parent's house. Defendant picked up Rebecca at her parent's house at about 10:30 p.m., and they returned to their house at about 11:00 p.m.

Shortly after 9:00 a.m. on January 14, Defendant knocked on his neighbor's door and asked to use the telephone to call 911. Defendant told his neighbor that he had been robbed and that his wife was hurt. Although the neighbor asked Defendant to stay, Defendant returned to his house. When police officers arrived at Defendant's house, they entered through the unlocked front door and announced their presence. The officers heard crying and whimpering coming from a bedroom. They entered the bedroom where they found Defendant kneeling over Rebecca who was lying on the bed. Defendant had a piece of red fabric in his hands, and he was crying and muttering "I'm sorry." Rebecca's face was purple and froth was coming from her mouth. Her body was cool to the touch. She was pronounced dead at the scene.

The house was not ransacked. A hanger and numerous neckties were found on the floor of the bedroom. The back door of the house was locked, and there were no signs of forced entry. The only identifiable fingerprints in the house belonged to Defendant. Defendant told the police that the telephone and answering machine were missing. These items normally sat on the nightstand in the bedroom. Impressions in the carpet indicated that the nightstand had been moved recently. There was no indication that the telephone cord had been forcefully removed from the jack behind the bed. Other items commonly stolen during a burglary, e.g., a television and a stereo remained.

Rebecca was wearing a T-shirt, underwear, and stretch pants, which were partially pulled down. There were no signs of sexual assault. She had an injury below her lip and above her chin and scratches on the right side of her face. Rebecca did not have any defensive wounds.

Rebecca died of ligature strangulation. The ligature marks were consistent with a telephone cord or a piece of clothing. Rebecca's death occurred sometime after 11:00 p.m. on January 13.

Defendant told the police that he woke up at 6:00 a.m. the morning of January 14. He took a bath, ate breakfast, got dressed, and said goodbye

to Rebecca at about 6:45 a.m. Defendant dropped their dog off at an animal hospital, for grooming at about 7:00 a.m. At 7:42 a.m., Defendant made a four-minute telephone call to Black Lake Lodge from his office at the church. Between 8:45 and 9:20 a.m., the church secretary arrived at work and found two memos and two notes from Defendant which had not been there when she left at about 4:00 or 4:30 p.m. the day before.

Defendant told police that he left the church around 8:45 a.m. to pick up Rebecca for her second interview at 10:00 a.m. Upon his arrival home, everything looked normal. Defendant became very nervous as he discussed discovering Rebecca's body. He said that she "looked like all of the blood had been sucked out of her face like you see on Star Trek," and he laughed. After finding Rebecca's body, Defendant indicated that he wrapped the ends of a necktie around each hand and tried to pull it apart in frustration. He also indicated that he was concerned about Rebecca being seen in her underwear by the police so he tried to put pants on her, but he only got them half way up.

When asked about the injuries to Rebecca's face, defendant said that their dog had scratched her a few days before. However, all of the people who had contact with Rebecca on the day preceding her murder testified that she had no cuts, scratches or other injuries to her face. Also, the medical examiner testified that the injuries were not consistent with a dog scratch. Further, the injuries were consistent with Defendant's ring.

Initially, Defendant indicated that he went out the back door of the house to get to his neighbor's house to call 911, but then he said he was not sure whether he went out the front door or the back door. Defendant also initially indicated that he had put the neckties on the floor in the bedroom, but then he said he did not know how they got there. Further, Defendant indicated that he had a $250,000 life insurance policy on himself and Rebecca but that "this is not a motive but I wanted you to know about the insurance policies."[2]

The next day, when asked by Rebecca's family whether she suffered, Defendant told them that he learned in the Army that it only takes 30 to 60 seconds to strangle someone so Rebecca did not suffer. Sherri Watkins ("Watkins"), Rebecca's best friend, visited the family as well. Defendant told her that the husband is always the first suspect but the best friend is second. When Watkins became upset, Defendant hugged her and said "we just need to stick together." Watkins also noted that Rebecca's personality

had been different when she was around Defendant.  Rebecca became quiet, submissive and was careful about what she said.

Additional evidence of Defendant's conduct after Rebecca's murder included the following.  Defendant declined Rebecca's family's offer for a double-depth burial plot so that Defendant could be buried with Rebecca.  Also, although Defendant received a $1,300 donation from the church, he only contributed $613 towards the $8,400 burial cost for Rebecca.  Further, two days after Rebecca's funeral, Rebecca's brother and sister found several of Rebecca's personal items discarded and exposed to the elements on the back porch of Defendant's house.

During Defendant's incarceration, he told two other inmates [Helmig and Conway] that he was gay and could never love a woman.  He also said that Rebecca was no better than him because she aborted another man's baby prior to their marriage.  Defendant also asked the inmates to help him fabricate evidence to incriminate others in Rebecca's murder.

_____

[1]  Rebecca began taking prescription sleeping pills because of rat problems while living at the Black Lake Lodge.

[2]  The insurance company subsequently contested Defendant's claim on the policy because Rebecca died within two years of its issuance. Eventually, the insurance company denied the claim because Defendant misrepresented Rebecca's annual salary on the policy application form. The insurance company settled the claim with Defendant for $20,000.

Resp. Ex. J. at 2-7.

To the above, the Court adds the following.  At one point in the trial before any reference had been made to Petitioner's sexual orientation, defense counsel stated at a bench conference that he understood the agreement on the matter to be that "the only thing that can be brought up as far as gay is in the statement of [the prosecutor's] snitches [i.e., Helmig and Conway]."  Resp. Ex. A at 775.  Defense counsel twice successfully objected to the matter being introduced in the testimony of witnesses other than Helmig

and Conway.  Id. at 775, 856.  The first reference to Petitioner being homosexual came in Conway's testimony, when Conway stated that Petitioner had told him in jail that he (Petitioner) had a large group of gay friends outside of jail who could help fabricate evidence to implicate others in the murder.  Defense counsel did not object.  Id. at 1493.  Later in Conway's testimony, when the prosecutor asked Conway whether Petitioner had ever discussed his (Petitioner's) relationship with men and women, defense counsel objected, but then withdrew the objection when the prosecutor explained, at a bench conference, that Conway's expected testimony would be that Petitioner had said that he preferred men over women but that his wife was no better than him because she was a murderer in that she had had an abortion.  Conway proceeded to testify as expected.  Id. at 1496-99.  Helmig's subsequent unobjected-to testimony on this matter was consistent with Conway's.  Id. at 1556-67.  In cross-examination of these two witnesses, defense counsel brought out their criminal histories and that they were testifying pursuant to a deal with the prosecution for their early release.  Id. at 1519-21, 1535-37, 1563.

Evidence was admitted that a semen stain, which did not match Petitioner, was found on the comforter in Petitioner's and the victim's bedroom.  Petitioner did not testify on his own behalf.

During closing argument, the prosecutor made numerous references to Helmig's and Conway's testimony regarding Petitioner's sexual orientation.  In trying to explain the source of the unidentified semen stain found on the comforter, the prosecutor stated, "You've got his statement to Conway and Helmig that he is a homosexual, that he prefers

men.  Is there any reason to believe that there isn't some other man that left that seminal fluid there at some other time?"  <u>Id.</u> at 1934.  In closing argument for Petitioner, defense counsel challenged this argument, stating that the only evidence that Petitioner was homosexual was the testimony of Conway and Helmig, and that these two witnesses were not to be believed because they testified in return for a deal from the prosecution.  <u>Id.</u> at 1969-71.  Then in final summation, the prosecutor argued that the evidence of Petitioner's homosexuality refuted the defense's position that Petitioner's marriage with the victim had been happy.  The prosecutor ended with, "The answer to that folks, is Helmig and Conway gave you the key to this lawsuit.  His homosexual feelings."  <u>Id.</u> at 2001.  Defense counsel did not object to any of these comments by the prosecutor.

The trial court rejected Petitioner's request for a circumstantial-evidence instruction that was based upon the following version of MAI-CR3d 310.02, which was in effect at the time of the crimes, but the second paragraph of which had since been declared invalid by the Missouri Supreme Court:

> Circumstantial evidence is the proof of facts or circumstances that give rise to a reasonable inference of other facts that tend to show the guilt or innocence of the defendant.  Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.
>
> You should not find the defendant guilty unless the facts and circumstances proved are consistent with each other and the guilt of the defendant, and inconsistent with any reasonable theory of his innocence.
>
> Petitioner's motion for judgment of acquittal at the close of the evidence was

overruled by the trial court.

**Post-trial Proceedings**

On October 24, 1997, the trial court granted Petitioner's motion for a new trial. The trial court believed that the State had made a submissible case "only by the narrowest of margins" and that, except for Conway's testimony, which was suspect, and Helmig's testimony to a lesser extent, the evidence pointed to two equally valid inferences. Resp. Ex. B at 72-73. On November 7, 1997, the State filed a motion for rehearing of the order granting a new trial. Resp. Ex. B at 74-97. This motion was denied on November 21, 1997, Resp. Ex. B at 101, and on that same day, the State filed a notice of appeal.

On November 17, 1998, the Missouri Court of Appeals reversed the grant of a new trial, and remanded the case for sentencing. The appellate court found that the reasons given by the trial court for granting a new trial were not supported by the record. The court noted that the equally-valid-inferences rule had been abolished in Missouri, citing cases from 1998, State v. Chaney, 967 S.W.2d 47 (Mo. 1998) (en banc), and 1993, State v. Grim, 854 S.W.2d 403 (Mo. 1993) (en banc), and that, therefore, the trial court's "reliance on the evidence supporting 'two equally valid inferences'" was improper.[2] The appellate court specifically left open the question of the sufficiency of the evidence. Resp. Ex. E.

On remand, the trial court sentenced Petitioner to life imprisonment without the

---

[2]   In Cheny, the Missouri Supreme Court explained that "[t]he equally valid inferences rule appears to be unique to Missouri and states that where two equally valid inferences can be drawn from the same evidence, the evidence does not establish guilt beyond a reasonable doubt." Cheny, 967 S.W.2d at 54. The Court further stated that the rule had been rejected by the Missouri Supreme Court in Grim, 854 S.W.2d at 405-08.

possibility of probation or parole. On October 27, 1999, Petitioner's direct appeal counsel filed a motion to recall the mandate, arguing that the appellate court did not have jurisdiction over the State's appeal from the order granting a new trial because it was not a final appealable order, and because the appeal was filed untimely. Doc. #19 at 3. The motion was summarily denied on November 15, 1999. Doc. #19 at 1.

**Direct Appeal**

The only issue raised on direct appeal was that the trial court erred in overruling Petitioner's motion for judgment of acquittal, because the evidence was insufficient to support the conviction, in violation of Petitioner's due process rights. Resp. Ex. H. The Missouri Court of Appeals summarized the evidence favorable to the verdict, as set forth above, and held as follows:

> Taken collectively, a summary of the evidence shows sufficient evidence from which a reasonable trier of fact might have found Defendant guilty beyond a reasonable doubt. Defendant dominated his relationship with Rebecca and quickly disposed of some of her personal items in an unusual manner after her death. Defendant obtained a $250,000 life insurance policy on Rebecca in October 1991. Rebecca was murdered two weeks before the initial quarterly premium on the policy expired. Defendant made false or inconsistent statements to the police and to Rebecca's family. See State v. Townsend, 810 S.W. 2d 726, 727 (Mo. App. E.D. 1991) (an attempt by defendant to deceive police is a circumstance which infers guilt). Also the injuries to Rebecca's face were consistent with Defendant's ring. Additionally, Defendant had the opportunity to commit the murder prior to leaving the house on January 14 after his phone call to Black Lake Lodge. Further, the evidence did not support a home-invasion. Finally, one's participation in a crime may be inferred from his or her presence at the scene, as well as his or her companionship and conduct both before and after the offense. Townsend, 810 S.W.2d at 727.

Resp. Ex. J.

**State Post-conviction Proceedings**

On July 10, 2000, Petitioner filed a pro se motion for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15. Appointed counsel filed an amended motion on October 10, 2000, raising the following claims (1) trial counsel was ineffective for failing to challenge the state appellate court's jurisdiction to hear the State's appeal of the order granting Petitioner a new trial, because the appeal was untimely; (2) trial counsel was ineffective for failing to object to testimony by Helmig and Conway, and to comments by the prosecutor during closing argument, indicating that Petitioner was homosexual, as such testimony and comments were irrelevant and more prejudicial than probative; (3) appellate counsel was ineffective for failing to raise the trial court's refusal to give a circumstantial-evidence instruction, in that the circumstantial-evidence rule was in effect in Missouri at the time of the crimes, and applying the subsequent judicial abolishment of that rule to Petitioner's case lowered the burden of proof upon the State to make a submissible case, in violation of the prohibition against ex post facto laws; and (4) appellate counsel was ineffective for failing to argue that the evidence was insufficient when considered under the rules of circumstantial evidence and equally valid inferences, rules which were both in effect at the time of the crimes. Resp. Ex. K-1 at 57-90.

Petitioner's lead trial counsel testified by deposition dated March 25, 2002, that he had extensive criminal defense experience. He testified that if the State's appeal from the order granting a new trial was late, this was not something he thought of at the time. Resp. Ex. M at 16. Counsel was then questioned about his failure to object to testimony

-12-

and comments inferring that Petitioner was homosexual.  Counsel stated that the motion in limine to exclude such references was filed because counsel felt such information would prejudice Petitioner before the jury, which was likely to be conservative, in light of the location of the trial.  Counsel testified that he thought Petitioner's homosexuality was "going to come out one way or the other" as the motive for the murder.  Counsel explained that he knew that the victim had had an abortion in the past, and he wanted to get this information to the jury, thinking it would work to Petitioner's benefit.  Counsel therefore decided, as a matter of trial strategy, not to object to Conway's testimony about Petitioner's homosexuality because the testimony would also allow counsel to get in evidence of the abortion.  Furthermore, Counsel believed that it would be better if references to Petitioner's homosexuality were admitted through the testimony of Helmig and Conway, whose credibility could easily be attacked.  Id. at 17-26.[3]

By letter dated September 13, 2002, while the post-conviction motion was pending, counsel for Petitioner cited the motion court to State v. Carter, 78 S.W.3d 786 (Mo. Ct. App. June 25, 2002), which held that an order granting a new trial in a criminal case was not a final appealable order.[4]

On November 26, 2002, the motion court denied Petitioner's motion for post-

_____

[3]    Counsel also testified that he did not put Petitioner on the stand to establish an alibi, because Petitioner told counsel that Petitioner had killed the victim.  Resp. Ex. M at 26-27.

[4]    A copy of this letter is not in the file before the Court, but no one disputes that it was received by the motion court.

conviction relief.  The court held that at the time that the State appealed the order granting

Petitioner's motion for a new trial, "there were cases holding that the State could appeal

in such situation and the law was not clear and unsettled."  Resp. Ex. K-2 at 197.  The

court held that under the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668

(1984) (holding that to constitute ineffective assistance of counsel under the Sixth

Amendment, counsel's performance must have fallen below an objective standard of

reasonableness, and such performance must have prejudiced the defendant in that "there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different"), counsel's conduct, viewed at the time of the

state's appeal, was reasonable.  The court continued as follows:

> Furthermore, this Court finds that counsel's decision to contest the
> State's appeal on the merits rather than raising a jurisdictional question was
> reasonable trial strategy inasmuch as a trial court has broad discretion in
> determining whether or not to grant a motion for a new trial, and that ruling
> will be affirmed on review unless it can be shown that the trial court's
> action was a clear abuse of discretion.
>
> This Court further finds that Movant has failed to show that there is a
> reasonable probability that, but for counsels' unprofessional errors, the
> result of the proceeding would have been different, the second prong of the
> <u>Strickland</u> test.  For example, as stated in <u>State v. Carter</u>, the state was not
> without recourse, and could have sought review of the trial court's order by
> way of remedial writ.

<u>Id.</u> at 199-200 (citations omitted).

The court next considered Petitioner's claim of ineffective assistance of trial

counsel for failing to object to testimony and closing argument suggesting that Petitioner

was homosexual.  The court pointed out that, contrary to Petitioner's assertions, the State

only agreed prior to trial not to mention Plaintiff's sexual preference in voir dire and opening statement. Reviewing the instance where the evidence of Plaintiff's homosexuality was followed by a reference to the victim's abortion, the court determined that defense counsel's decision to withdraw his objection to the homosexuality reference was reasonable trial strategy. The court also held that the evidence of Plaintiff's homosexuality, even to the extent that it was evidence of other bad acts, was admissible to show motive; and that Petitioner did not meet the prejudice prong of the Strickland standard in that he failed to show that but for counsel's challenged conduct, the result of the trial would have been different. Id. at 201-06.

With respect to appellate counsel, the motion first noted that by the time of Petitioner's trial, the circumstantial-evidence rule had been abolished by the Missouri Supreme Court. The court also found that Petitioner's conviction was not "exclusively based" on circumstantial evidence, and therefore, even had the instruction been applicable, it would not have been error to refuse it, under Missouri law. The court found that appellate counsel, who was very experienced, "exercised reasonably effective trial strategy in not raising this issue on appeal," and further that counsel was bound by the law existing at the time of the trial. Additionally, the motion court found, without elaboration, that "even assuming such instruction could have properly been given, the failure to give same was not outcome determinative." Id. at 208-10.

On appeal from the denial of post-conviction relief, Petitioner's counsel raised the first three points in his amended motion noted above. Resp. Ex. O. The Missouri Court

of Appeals affirmed the denial of post-conviction relief. The appellate court addressed trial counsel's effectiveness with regard to both jurisdictional issues related to the State's appeal from the order granting Petitioner a new trial -- the timeliness of the appeal and the appealability of the order. The court concluded that on both issues, none of the existing case law was controlling at the time in question, and that trial counsel could not be said to have been ineffective for failing to raise jurisdictional issues on appeal that even the state appellate court had overlooked. The court also concluded that Petitioner failed to show prejudice, as had the timeliness issue been raised, the court may have granted the State leave to file the appeal out of time, the State could have sought relief through an extraordinary writ, and Petitioner could not show that on re-trial he would have been acquitted.

Addressing the claim that trial counsel was ineffective for failing to object to references of Petitioner's homosexuality, the appellate court held that Petitioner did not overcome the presumption that counsel acted professionally and that any challenged action was a part of counsel's sound trial strategy. The appellate court stated that counsel's deposition testimony demonstrated that the decision not to object was reasonable trial strategy, as follows:

> Counsel reasonably believed that references to Petitioner's sexual orientation would come out at trial one way or another – likely to show motive (the defense theory was that [Petitioner] and the victim had a happy marriage and he had no motive to kill his wife). It was determined that not objecting when the State opened the door to [Petitioner's] character would give defense counsel the opportunity to present evidence of the victim's character, particularly that she had had an abortion. Counsel felt that both

pieces of information – homosexuality and abortion – would be influential
with the conservative jury. As to references to [Petitioner's] sexual
orientation by jailhouse informants, the strategy was to demonstrate that
they were lying in exchange for something from the government.

Resp. Ex. Q at 4-5.

Lastly, the appellate court held that the motion court did not err in finding that

Petitioner's direct appeal counsel was not ineffective for failing to raise the issue of the

circumstantial-evidence instruction, because Petitioner's ex post facto argument was

"wholly without merit." The court explained that the Missouri constitution's prohibition

against ex post facto laws applied only to legislative enactment and not judicial decisions.

As the circumstantial-evidence rule was a common law development, the Missouri

Supreme Court's abolition of that rule and the instruction based thereon was not an ex

post facto "law." The court also cited State v. Woodworth, 941 S.W.2d 679, 700 (Mo. Ct.

App. 1997) (holding, without any reasoning, that the trial court properly refused to give

the repealed version of the instruction where the crimes were committed before Grim), as

a case rejecting a similar argument on other grounds. Resp. Ex. Q.

## DISCUSSION

As noted above, Petitioner raises the following grounds for federal habeas relief:

The appellate court lacked jurisdiction to hear the State's appeal of the
order granting a new trial, because the appeal was filed beyond the ten-day
period for filing such an appeal.

Petitioner's trial counsel was ineffective in failing to object to the admission
of evidence and comments by the prosecutor during closing argument
indicating that Petitioner was homosexual.

-17-

The trial court rejected Petitioner's request to give a circumstantial-evidence instruction, and counsel on direct appeal was ineffective for failing to raise this matter.

Two claims raised in Petitioner's pro se motion for post-conviction relief were not addressed by the motion court and were not raised by Petitioner's post-conviction appellate counsel.

## Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court's adjudication:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "AEDPA effected a move toward greater deference in the § 2254 courts' review of state-court decisions."  Brown v. Leubbers, 371 F.3d 458, 460 (8th Cir. 2004) (en banc).

The "contrary to" clause is satisfied if a state court has arrived "'at a conclusion opposite to that reached by [the Supreme Court] on a question of law'" or "'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent'" but arrives at the opposite result.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies

that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413; <u>Linehan v. Milczark</u>, 315 F.3d 920, 924-25 (8th Cir. 2003).

A case cannot be overturned merely because it incorrectly applies federal law; the application must also be "unreasonable." <u>Williams</u>, 529 U.S. at 411; <u>Colvin v. Taylor</u>, 324 F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is <u>both</u> wrong <u>and</u> unreasonable"). "The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to an even more deferential review . . . ." <u>Kinder v. Bowersox</u>, 272 F.3d 532, 538 (8th Cir. 2001). "Factual findings by the state court 'shall be presumed to be correct,' a presumption that will be rebutted only by 'clear and convincing evidence.'" <u>Id.</u> (quoting § 2254(e)(1)).

## **State Appellate Court's Jurisdiction over Order Granting New Trial**

Petitioner argues that the Missouri Court of Appeals was without jurisdiction to hear the State's appeal from the order granting him a new trial, because the appeal was filed more than ten days after the order was issued. Indeed, Petitioner is right on the underlying jurisdictional point. Prior to its decision in 2002 in <u>State v. Carter</u>, clarifying that an order granting a new trial in a criminal case was not a final appealable order, the Missouri Court of Appeals held in 1999, in <u>State v. Casebolt</u>, 994 S.W.2d 114 (Mo. Ct. App. 1999), that an appeal from such an order had to be filed within ten days of the order. Nevertheless, the Court concludes that any error by the state court for accepting the appeal in question in this case does not constitute a violation of Plaintiff's federal constitutional rights. "[A] mere violation of state law is not the automatic equivalent of a violation of the federal

Constitution." Lannert v. Jones, 321 F.3d 747, 751-52 (8th Cir. 2003) (quoting Chambers v. Bowersox, 157 F.3d 560, 564 (8th Cir. 1998)). This is not an absolute, however, and in certain limited instances, a violation of state law may implicate a criminal defendant's federal constitutional rights. See Hicks v. Oklahoma, 447 U.S. 343 (1980). In Hicks the United States Supreme Court held as follows:

> [w]here ... a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.

Id. at 346 (citation omitted). Hicks has been read very narrowly to mean that "some aspects of the sentencing process, created by state law, are so fundamental that the state must adhere to them in order to impose a valid sentence." Chambers, 157 F.3d at 564-65. What happened to Petitioner here may not have been in compliance with state procedural law, but the mistake was not a fundamental part of the sentencing process so as to implicate Petitioner's federal constitutional rights. See id. (holding that petitioner's federal due process rights were not violated where testimony of a probation officer was received during the sentencing phase of petitioner's trial in violation of a state statute providing that such information was privileged from such disclosure).[5] Accordingly, habeas relief is not

---

[5]     Petitioner does not raise a claim in his habeas petition that trial counsel was ineffective for failing to object to the appellate court's jurisdiction. The Court notes, in any event, that such a claim would have failed. The state courts determined that at the relevant time, Missouri law was not clear on the two jurisdictional issues raised by

available on this claim.

## Ineffective Assistance of Trial Counsel - References to Petitioner's Homosexuality

Petitioner argues that his trial counsel rendered constitutionally ineffective assistance by failing to object to the evidence, as well as to the prosecutor's comments during closing argument, indicating that Petitioner was homosexual.

As noted above, to succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish both "that counsel's representation fell below an objective standard of reasonableness," and that but for counsel's deficiency there is "a reasonable probability" that the result of the trial would have been different. Strickland, 466 U.S. at 688; see also Cagle v. Norris, 474 F.3d 1090, 1095 (8th Cir. 2007). Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal citations omitted); see also Abdi v. Hatch, 450 F.3d 334, 337 (8th Cir. 2006); Lyons v. Leubbers, 403 F.3d 585, 594 (8th Cir. 2005).

_____

Petitioner, and that thus, defense counsel's performance could not be said to be below the Strickland standard of reasonableness.

Under Strickland, in determining whether the performance of counsel was deficient, the challenged conduct must be "viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. In doing so, this Court cannot say the Missouri courts' decisions were "contrary to, or involved an unreasonable application of," Strickland, or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as required for habeas relief under 28 U.S.C. § 2254(d).

Error by counsel, even if professionally unreasonable, does not necessarily require that a judgment be set aside. A defendant must affirmatively show prejudice by showing that but for counsel's error, there is a reasonable probability that the result of the proceeding would have been different. Strickland, 466 U.S. at 693. Moreover, in the context of a § 2254 petition, a petitioner

> "must do more than show that he would have satisfied Strickland's test if his
> claims were being analyzed in the first instance, because under § 2254(d)(1),
> it is not enough to convince a federal habeas court that, in its independent
> judgment, the state-court decision applied Strickland incorrectly. Rather he must show that
> the [state court] applied Strickland to the facts of his case in an objectively unreasonable
> manner."

Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)).

Here, the state courts did not misread the factual record, and the conclusion that counsel's conduct was a matter of reasonable trial strategy is appropriately based upon trial counsel's testimony at the post-conviction evidentiary hearing. The record shows that counsel kept out mention of Petitioner's sexual orientation during voir dire and opening statement, and successfully objected to reference to this matter by two prosecution witnesses. Counsel testified that he then decided to let Conway testify about Plaintiff's homosexuality, a matter that counsel felt the prosecution would get in somehow. By allowing Conway to testify as he did, counsel was able to also inform the jury that the victim had had an abortion. Counsel also testified that he believed that it would better if the references to Petitioner's homosexuality were made by witnesses whose credibility

could be easily impeached. The state courts analyzed this claim under the <u>Strickland</u> framework, and upon review of the record, this Court cannot say that the state courts' adjudication of the claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," as required for habeas relief under 28 U.S.C. § 2254(d).

**<u>Circumstantial Evidence Instruction/Ineffective Assistance of Direct Appeal Counsel</u>**

Petitioner argues that his constitutional rights under the Ex Post Facto Clause were violated by the refusal of the trial court to give the requested circumstantial-evidence instruction, and that his constitutional right to effective assistance of direct appeal counsel was violated due to counsel's failure to raise this matter on appeal.

As indicated above, at the time that Petitioner committed the crimes in this case, Missouri trial courts were obligated to give the following instruction in cases based wholly on circumstantial evidence:

> Circumstantial evidence is the proof of facts or circumstances that give rise to a reasonable inference of other facts that tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.

> You should not find the defendant guilty unless the facts and circumstances proved are consistent with each other and the guilt of the defendant, and inconsistent with any reasonable theory of his innocence.

In May 2003, in <u>Grim</u>, 854 S.W.2d at 407-08, the Missouri Supreme Court ruled that the second paragraph "shall no longer be given," because it did not correctly state the law, and functioned to confuse and mislead jurors. In <u>State v. Woodworth</u>, 941 S.W.2d at 700,

the state appellate court held that the trial court properly refused to give the repealed

version of the instruction where the crimes were committed before Grim.  And in State v.

Sutherland, 859 S.W.2d 801, 804 (Mo. Ct. App. 1993), the state appellate court held that

failing to give the first paragraph of the instruction that remained after Grim "cannot

possibly cause prejudice to a defendant."

Here, the Court takes issue with the trial court's finding that the case was not

exclusively based on circumstantial evidence, and therefore, even had the requested

instruction been applicable, it would not have been error to refuse it.  Furthermore, the state

courts' failed to analyze the instructional issue under the federal Ex Post Facto Clause.

Article I, Section 10, Clause 1 of the federal Constitution prohibits states from

passing any "ex post facto Law."  In California Department. of Corrections. v. Morales,

514 U.S. 499 (1995), the Supreme Court explained that "the focus of the ex post facto

inquiry is not on whether a legislative change produces some ambiguous sort of

'disadvantage'[.] . . .  [Rather, the test is] whether any [new law] alters the definition of

criminal conduct or increases the penalty by which a crime is punishable."  Morales, 514

U.S. at 506 n. 3.  Although "[t]he Ex Post Facto Clause is a limitation upon the powers of

the Legislature and does not of its own force apply to the Judicial Branch," the Supreme

Court has applied this rule equally to state supreme courts through the Due Process Clause

of the Fourteenth Amendment.  See Bouie v. City of Columbia, 378 U.S. 347, 353-54

(1964) ("If a state legislature is barred by the Ex Post Facto Clause from passing such a

law, it must follow that a State Supreme Court is barred by the Due Process Clause from

achieving precisely the same result by judicial construction.").

Although the Ex Post Facto Clause can apply to judicial decisions, here the Court concludes that the Missouri Supreme Court's decision in <u>Grim</u> was not a prohibited ex post facto law. The change in Missouri law with respect to the circumstantial evidence instruction did not alter the definition of the crimes for which Petitioner was convicted, nor increase the penalty for those crimes. <u>See</u> <u>State v. Webb</u>, 638 N.E. 2d 1023, 1029-30 (1994) (arriving at the same conclusion in a similar situation in a different state). Because the federal ex post facto claim is without merit, appellate counsel cannot be faulted for not raising it on appeal.

**<u>Unaddressed Claims Raised in Petitioner's Pro Se Motion for Post-conviction Relief</u>**

Finally, Petitioner claims that his constitutional rights were violated because two claims raised in his pro se post-conviction motion, but not included in the amended motion prepared with the assistance of appointed counsel, were not addressed by the motion court or by Petitioner's post-conviction appellate counsel.[6] As noted above, Respondent did not address this claim. Petitioner, however, cannot prevail on this claim. A federal habeas court may not review issues that the petitioner defaulted in state court "pursuant to an independent and adequate state procedural rule . . . unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage

---

[6] These claims were that he was improperly subjected to a second preliminary hearing, and that the State intimidated a witness (Jonathan Gibson) into testifying.

of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). The procedural rule must be "firmly established, regularly followed and readily ascertainable when it was applied." <u>Winfield v. Roper</u>, 460 F.3d 1026, 1036 (8th Cir. 2006).[7]

The Eighth Circuit has held that a Missouri prisoner's claim that was raised in his pro se Rule 29.15 motion, but not pursued by appointed counsel, or raised on appeal from the denial of the motion, was defaulted in state court and thus not reviewable by a federal habeas court, unless the petitioner shows cause and prejudice for the default or a miscarriage of justice. <u>Interiano v. Dormire</u>, 471 F.3d. 854, 856 (8th Cir. 2006) (citing <u>Osborne v. Purkett</u>, 411 F.3d 911, 919-20 (8th Cir. 2005)). Indeed, Missouri courts have specifically recognized this default. <u>See</u> <u>Self v. State</u>, 14 S.W.3d 223, 226-27 (Mo. Ct. App. 2000) (allegations in a pro se post-conviction motion that are not included in an amended motion filed by appointed counsel are not for consideration; "The motion court had no duty to respond to the allegations in movant's pro se motion that were not in the amended motion.").[8]

As there is no federal constitutional right to counsel in state post-conviction proceedings, even when state law requires the state to appoint counsel to represent the petitioner in those proceedings, there can be no constitutional deprivation of effective

---

[7]    This Court has the discretion to consider an issue of procedural default sua sponte. <u>See</u> <u>King v. Kemna</u>, 266 F.3d 816, 822 (8th Cir. 2001).

[8]    The Court notes that the Eighth Circuit follows the same practice. <u>See</u> <u>United States v. Stanko</u>, ___ F.3d ___, 2007 WL 1757723, at *112 n.2 (8th Cir. June 20, 2007) (noting Eighth Circuit's practice to decline to consider pro se briefs filed by parties represented by counsel).

assistance by post-conviction counsel.  <u>Simpson v. Norris</u>, ___ F.3d ___, 2007 WL

1827496, at *3-4 (8th Cir. June 27, 2007) (citing <u>Wainwright v. Torna</u>, 455 U.S. 586, 587-

88 (1982)).  Thus, Petitioner cannot rely on his post-conviction counsel's performance as

cause for the procedural default.  <u>See</u> <u>Interiano</u>, 471 F.3d at 856-57.  Nor has he made any

showing of a miscarriage of justice with regard to the two omitted claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court concludes that Petitioner is not entitled to

habeas relief.  The Court also does not believe that "reasonable jurists" might find that the

Court's assessment of Petitioner's claims for habeas relief "debatable or wrong," for

purposes of issuing a Certificate of Appealability under 28 U.S.C. §2254(d)(2).  <u>See</u> <u>Miller-</u>

<u>El v. Cockrell</u>, 537 U.S. 322, 338 (2003)(quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484

(2000)).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of Scott Brown for habeas

corpus relief be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability should be

denied on all claims.

The parties are advised that they have ten (10) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

extension of time for good cause is obtained, and that the failure to file timely objections may result in a waiver of the right to appeal questions of fact.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of July, 2007.